IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 3, 2021 Session

## STATE OF TENNESSEE v. BRAXTON LEVAR TAYLOR

**Appeal from the Circuit Court for Madison County**
**No. 18-758    Donald H. Allen, Judge**

_____

### No. W2020-00437-CCA-R3-CD
_____

A Madison County jury convicted the defendant, Braxton Levar Taylor, of second-degree murder and unlawful possession of a firearm for which he received an effective sentence of twenty-five years' incarceration.  On appeal, the defendant argues the trial court erred in denying two, pre-trial motions to suppress the victim's dying declaration, wherein the victim named the defendant as his shooter, and a photographic lineup which contained his picture and resulted in two witness identifications.  The defendant also argues the trial court erred by failing to provide a jury instruction concerning the victim's dying declaration and in sentencing.  Following our review of the briefs, the record, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and TIMOTHY L. EASTER, JJ., joined.

Patrick S. Rader, Assistant Public Defender - Appellate Division, Franklin, Tennessee (on appeal) and Gregory D. Gookin, Assistant Public Defender, Jackson, Tennessee (at trial), for the appellant, Braxton Levar Taylor.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Bradley F. Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual and Procedural History*

On January 28, 2018, the defendant fired numerous shots at the victim, Daithan Cobb, in Madison County, Tennessee. Several law enforcement officers and paramedics responded to the scene of the shooting, including Sergeant Donald Laux of the Jackson Police Department. While the victim was being treated by paramedics, Sergeant Laux asked the victim who shot him, and the victim named the defendant. As the investigation progressed, Sergeant Laux developed the defendant as a suspect, created a photographic lineup containing the defendant's picture, and presented the lineup to two witnesses, Meribeth Holt and Josh Steiner. Both Ms. Holt and Mr. Steiner separately identified the defendant in the lineup. On February 11, 2018, the victim died from the injuries he suffered as a result of the shooting, and a Madison County Grand Jury subsequently indicted the defendant for first-degree murder (count 1) and unlawful possession of a firearm (count 2). Prior to trial and pertinent to this appeal, the defendant filed motions to exclude the "alleged 'dying declaration' of [the] victim" and to suppress the photographic lineup used in the investigation. The trial court addressed the defendant's motions in separate hearings.

## I.    Motion in Limine

The defendant filed a motion in limine "to exclude from evidence any testimony or reference to the victim's alleged 'dying declaration' identifying the [d]efendant as his killer." The defendant argued "there is no indication that [the victim] was under the belief that his death was imminent on January 28, 2018, when he told law enforcement that the [d]efendant was his assailant." As a result, the defendant asserted the statement did "not meet the strict requirements of Rule 804(b)(2) of the Tennessee Rules of Evidence," the dying declaration exception to the rule against hearsay. The State disagreed, and presented evidence regarding the admissibility of the victim's statement at the hearing.

Jackson Police Department Captain Jeff Shepard responded to the shooting on January 28, 2018. When he arrived, Captain Shepard found the victim lying in an alleyway behind the La Paree Apartments in Jackson, Tennessee. Patrol officers were attempting to render aid to the victim who had been shot several times in the torso. Captain Shepard noticed blood and stated the victim was sweating and having trouble breathing. The victim was quickly placed in an ambulance where he continued to receive medical attention.

Sergeant Laux soon arrived on the scene, and Captain Shepard asked Sergeant Laux if anyone had questioned the victim as to who shot him. Because Sergeant Laux did not know if anyone had questioned the victim, the two approached the ambulance in order to do so. Captain Shepard saw that the victim was sweating, violently shaking, and breathing through an oxygen mask, and heard Sergeant Laux ask the victim who shot him. According to Captain Shepard, the victim "looked very scared. His eyes got real (sic) wide. It was difficult for [the victim] to speak, but he got out, Braxton Taylor." Paramedics then left the scene with the victim as he was in critical condition.

Captain Shepard testified that during his twenty-seven years in law enforcement, he has frequently encountered victims of gunshot wounds, is familiar with the severity of such wounds, and has seen someone die in his presence. When asked if he believed the victim was in fear that his death was imminent when answering Sergeant Laux's question, Captain Shepard responded, "[a]bsolutely." Captain Shepard also noted the victim's voice was "broken, raspy, like it was difficult to speak," but the victim did not lose consciousness while on the scene.

Sergeant Laux provided additional details surrounding the victim's statement, noting he first saw the victim in the back of the ambulance surrounded by paramedics who "looked like they were working vigorously to take care of [the victim], give him medical treatment." In order to ask the victim if he knew who shot him, Sergeant Laux stepped onto the side of the ambulance. During the interaction, the victim "appeared to be distressed, was on his back, looked scared," and the victim's eyes were wide and "[h]e just had that . . . panicked and scared look on his face." Sergeant Laux did not recall if the victim was sweating but noted he did not see the victim shaking and that the victim's oxygen mask "[l]ooked like it was still half-way on." The victim answered Sergeant Laux's question, naming Braxton Taylor as his shooter. Sergeant Laux believed the victim was in fear of dying when he named the defendant, noting the victim's voice was "a panicked sound, crackling, [] like he was having trouble breathing." Sergeant Laux stated he did not see the victim lose consciousness, nor was he able to see the victim's injuries or blood during the interaction.

Dr. Michael Allen Revelle treated the victim in the emergency room of Jackson-Madison County General Hospital immediately after the shooting. Upon arrival, the victim was alert, having trouble breathing, and complaining of chest pain and pain around his gunshot wounds. Dr. Revelle noted the victim suffered five gunshot wounds to the left leg and torso, including the chest, abdomen, and flank area. Dr. Revelle classified the victim's injuries as life-threatening and his condition as critical as there was a high likelihood the victim could die from the injuries. Furthermore, Dr. Revelle agreed the victim was on the verge of death when he arrived at the hospital but medical interventions and the proximity of the crime scene to the hospital prevented the victim from dying sooner.

Dr. Revelle detailed the life support treatment he provided to the victim, as follows:

We -- paramedics had decompressed his chest, so he had a gunshot wound to the chest, was a high likelihood he had [a] collapsed lung or blood in that lung. We converted that to a chest tube or a tube thoracostomy. Basically, placed a chest tube in the thorax to relieve the air and blood so that his lung would re-expand, and he would be able to use that lung. We also put a central

line to the big IV catheter so that we could administer blood, fluids, things of that nature, if needed. And ultimately, while he was there, we elected to intubate him or take his airway and breathe for him because of the severity of his injuries and transfer him to a Level 1 trauma center.

Dr. Revelle believed the victim would have died without the treatment provided but the victim ultimately needed care from a Level 1 trauma center. As such, a helicopter transported the victim to Regional One in Memphis. Upon transfer, the victim's "vital signs were stable, but again, but based on the severity of his injuries and their location, he was -- remained in critical condition. Critical but stable." Dr. Revelle did not provide additional care to the victim but reviewed the victim's death certificate and confirmed the victim died from his injuries on February 11, 2018. The death certificate was entered into evidence.

Upon its review, the trial court denied the defendant's motion in limine, both orally and in writing, finding the victim's statement qualified as a dying declaration under the exception to the rule against hearsay. Tenn. R. Evid. 804(b)(2). The State proceeded to trial with this evidence.

## II. Motion to Suppress

The trial court also conducted a pre-trial hearing on the defendant's motion to suppress the photographic lineup and the identifications made by Ms. Holt and Mr. Steiner who witnessed an incident between the defendant and the victim prior to the shooting. The defendant argued that because Investigator Ron Pugh of the Jackson Police Department "presented the same lineup" to Ms. Holt and Mr. Steiner, "the identification process utilized was unnecessarily suggestive, and that this resulted in a misidentification of the [d]efendant as the perpetrator of the alleged offenses." The State responded, arguing the lineup "was not in any way suggestive" and the identifications were reliable. At the suppression hearing, the State presented evidence regarding the admissibility of the photographic lineup through the testimony of Ms. Holt, Mr. Steiner, and Investigator Pugh.

Investigator Pugh led the investigation into the victim's shooting. By January 29, 2018, the day after the shooting, Investigator Pugh had developed the defendant as a suspect, created a photographic lineup which included the defendant's picture, and planned to interview Ms. Holt at her home. However, after arriving at the home and briefly speaking with Ms. Holt, Investigator Pugh realized that her husband, Mr. Steiner, was also a witness. Thus, Investigator Pugh separated Mr. Steiner and Ms. Holt before conducting the interviews. During each interview, Investigator Pugh obtained adopted, written statements and presented the photographic lineup he created to Mr. Steiner and Ms. Holt.

The lineup contained six pictures, three on the top row and three on the bottom row, and included the defendant's picture which was located in the middle of the bottom row. Regarding the photographs used in the lineup, Investigator Pugh stated "[t]here may be some difference" between the lighting on the faces of the top three pictures compared to the bottom three pictures but, "not much," and the hairstyles of the men in the pictures were also "all very similar." The photographic lineup was entered into evidence.

Investigator Pugh testified he provided general instructions to Mr. Steiner and Ms. Holt before they reviewed the lineup, stating: "This is going to be a photo lineup. A suspect might or might not be included in these pictures. Do you see anyone who looks familiar? . . . And I always tell them, I'd rather you not pick someone as to pick someone that you're unsure of." Investigator Pugh first showed the lineup to Mr. Steiner who identified the defendant and signed underneath the defendant's picture. Investigator Pugh stated he usually has witnesses circle a picture when making an identification, but in this case, Investigator Pugh did not want Mr. Steiner to "adulterate the top" of the lineup because he planned to show the lineup to Ms. Holt. Ms. Holt was not present as Mr. Steiner reviewed the lineup.

Investigator Pugh next showed the lineup to Ms. Holt, noting she was unaware that Mr. Steiner had previously viewed the lineup and identified the defendant. In order to protect Mr. Steiner's identification, Investigator Pugh used a manila file folder to cover the bottom part of the lineup where Mr. Steiner signed his name though he did not explain to Ms. Holt why he covered the bottom of the lineup. Upon her review, Ms. Holt also identified the defendant and signed her name underneath the defendant's picture.

Investigator Pugh explained he did not suggest to either Mr. Steiner or Ms. Holt that the suspect's picture was included in the photographic lineup nor did he suggest who they should identify. Furthermore, there were no visible markings on the lineup to indicate what the other witness had marked or selected. Investigator Pugh admitted he could have created a second lineup but chose not to do so. Regarding the certainty of Mr. Steiner and Ms. Holt's identifications, Investigator Pugh stated, "[n]either one hesitated."

Ms. Holt explained she witnessed the events which led to the shooting on January 28, 2018. She was in the backyard with Mr. Steiner and their children before the shooting occurred. When Ms. Holt walked to the front of the house to put a baby stroller in her car, she noticed "a red car that was just stopped like in the middle of the road." Ms. Holt also saw a pedestrian, who was later identified as the victim, "walking down the street toward like our backyard." As the victim walked, Ms. Holt saw a man, who she later identified as the defendant, get out of the passenger seat of the red vehicle and yell at the victim.

Ms. Holt continued to observe the interactions between the defendant and the victim and heard the defendant yell things like, "'I'm going to get you; you can run, there's no stopping it.'" The defendant then returned to the red vehicle, and the driver of the vehicle "drove around to cutoff" the victim. The victim ignored the vehicle, the driver, and the defendant and turned into the alleyway behind Ms. Holt's home. The defendant and the driver continued yelling at the victim, stating "'I'm going to get your a\*\*. You can't run. You know what you did. I'm going to shoot you.'" After the victim turned into the alleyway, the defendant and the driver returned to the red vehicle. Less than five minutes later, Ms. Holt heard four to six gunshots.

Ms. Holt observed the defendant's face during the incident but was unable to see the driver clearly because the driver's back was turned "most of the time when he got out of the car." According to Ms. Holt, the driver only exited the vehicle for about thirty-five seconds whereas the defendant was outside of the vehicle for a few minutes. Though Ms. Holt and Mr. Steiner discussed what they witnessed prior to the shooting, Ms. Holt did not provide Mr. Steiner with a description of the defendant.

After connecting what she observed to the victim's shooting, Ms. Holt called the police on January 29, 2018, "to make a tip because [she] thought that the shooting was related to what we had seen." Ms. Holt later spoke with Investigator Pugh at her home. She identified where the events occurred to Investigator Pugh before he conducted separate interviews with her and Mr. Steiner, speaking with Mr. Steiner first. At the time, Ms. Holt "was freaking out" and called her mother. Thus, she was not listening to Mr. Steiner's interview with Investigator Pugh. When Mr. Steiner's interview ended, he went inside to watch their children, and Ms. Holt went outside for her interview.

Regarding the photographic lineup, Ms. Holt explained she did not know the lineup existed until Investigator Pugh presented it to her during the interview and she did not see Mr. Steiner review the lineup. She stated Investigator Pugh did not make any promises to her about whether the suspect was included in the lineup and did not suggest who she should identify. Ms. Holt recalled Investigator Pugh's pulling the lineup out of a manila file folder but stated the manila file folder did not influence her review of the lineup. Investigator Pugh twice asked Ms. Holt if she recognized anyone in the lineup, and Ms. Holt pointed to the defendant's picture in the middle of the bottom row. After confirming that Ms. Holt was sure about her identification, Investigator Pugh removed the manila file folder, explained why the folder was used, and stated, "'Okay. Well, I need you to sign it. [Mr. Steiner] has also pointed out the same person.'" Ms. Holt stated that when she selected the defendant's picture she could not see Mr. Steiner's signature and "didn't even know that he had looked at a lineup at this point." Ms. Holt noted the pictures in the lineup "looked pretty similar" but she was "most definitely" confident in her identification of the

defendant as the person she saw prior to the shooting. During the hearing, Ms. Holt identified her signature on the lineup and noted she did not know the defendant.

Mr. Steiner also testified, stating he witnessed the events prior to the shooting about which he spoke to Investigator Pugh the following day. Mr. Steiner recalled Investigator Pugh's presenting a photographic lineup to him and asking if he recognized anyone from the shooting. Mr. Steiner noted that Investigator Pugh did not promise that the suspect was included in the lineup and did not suggest who Mr. Steiner should select from the lineup. Mr. Steiner did not see any suggestive markings on the lineup.

Mr. Steiner selected the defendant's picture as the person he saw prior to the shooting and signed below the defendant's picture. He again noted that Ms. Holt was not present when he reviewed the lineup nor was he present during Ms. Holt's interview with Investigator Pugh. When asked if the lighting of the top pictures appeared brighter than the bottom pictures in the lineup, Mr. Steiner stated, "I mean, I guess you could say that, yes."

Upon its review, the trial court issued an oral and written order denying the defendant's motion to suppress the photographic lineup finding that the lineup was not suggestive and the identifications made by Ms. Holt and Mr. Steiner were reliable. The State proceeded to trial with this evidence.

III.  *Trial*

The trial began with similar testimony from Ms. Holt and Mr. Steiner. While in front of her home on January 28, 2018, Ms. Holt witnessed a "confrontation" between the defendant and the victim. Ms. Holt first noticed a red vehicle that had stopped "sporadic[ly]" in the street and saw the victim walking down the street. The defendant then exited the passenger side of the red vehicle and yelled at the victim. The driver remained in the red vehicle. As Ms. Holt walked to her backyard, the victim continued walking down the street, and the defendant got back into the red vehicle. The vehicle then "tried to kind of like cut off the [victim]," who "continued to mind his own business, hands in his pocket, continued to walk." The driver and the defendant exited the vehicle and threatened the victim. The driver and the defendant yelled, "'You can run. I'm going to get your ass. We're going to get you.'" Though the driver remained by the vehicle, the defendant approached the victim during this second confrontation.

The victim then turned into an alleyway, and the defendant "and the driver looked at each other. They were like, 'Let's go get him,' and then they sped off and cut [the victim] off at I believe North Highland Avenue." Ms. Holt believed both the defendant and the driver stated, "Let's go get him" but admitted she might not remember the exact

words of the defendant as she heard the defendant yell several things at the victim during the confrontation. Ms. Holt then saw the defendant and the driver enter the red vehicle, drive towards North Highland Avenue, and turn onto Roland Avenue. Less than two minutes later, Ms. Holt heard four to six gunshots and hoped the gunshots "weren't related to the confrontation that [she] had just seen." However, upon realizing the confrontation was related to the shooting, Ms. Holt contacted law enforcement the next day and met with Investigator Pugh. Ms. Holt ultimately provided a written statement detailing the events she witnessed and identified the defendant in a photographic lineup.

During her testimony, Ms. Holt identified on a map where the confrontation occurred, marking the movements of the victim, the defendant, and the red vehicle on the map. Ms. Holt explained that as the confrontation continued, the victim turned down an alleyway located directly behind her home. Because Ms. Holt's home is surrounded by a chain link fence, she was able to see the victim as he continued down the alleyway. However, once the victim passed by her neighbor's home, Ms. Holt lost sight of him. The map was entered into evidence.

During the confrontation, Ms. Holt did not see the victim remove his hands from his pockets, acknowledge the driver or the defendant, or respond to their remarks. According to Ms. Holt, the victim "seemed like he wanted absolutely nothing to do with anything that they were trying to be involved in." Ms. Holt then reviewed a photograph of the victim and identified him as the pedestrian involved in the confrontation with the defendant. The photograph was entered into evidence.

Ms. Holt also identified the defendant at trial and reviewed the photographic lineup presented to her by Investigator Pugh on January 29, 2018. Ms. Holt stated she identified the defendant in the lineup as the passenger of the red vehicle, noting she was "one hundred percent" confident in her identification. The State moved the photographic lineup into evidence, and the defendant, relying on his motion to suppress, renewed his objection to the lineup. After a brief bench conference, the trial court overruled the objection and allowed the lineup to be entered into evidence.

Ms. Holt provided additional details of her review of the photographic lineup and her identification of the defendant. Before selecting the defendant's picture, Ms. Holt reviewed the lineup by "assess[ing] all [of] the pictures to the best of [her] abilities." Ms. Holt then selected the defendant's picture which "stood out amongst all of the rest of them." Ms. Holt initially pointed to the defendant's picture, and Investigator Pugh asked if she was certain of her identification. Ms. Holt confirmed that she was and then signed her name below the defendant's picture. Ms. Holt stated the six pictures used in the lineup all looked "similar" even though the men in the pictures on the top row might have "a little lighter skin color instead of having a better lit photo." Though Ms. Holt acknowledged the

other pictures in the lineup were similar to the defendant's picture, she confirmed she saw the defendant confronting the victim on January 28, 2018.

Ms. Holt, however, was unable to identify the driver of the red vehicle, noting the driver "seemed like a hype man." Ms. Holt stated "[I]t was definitely agreed upon that [the defendant and the driver] were going to try and get [the victim]." Ms. Holt did not see the defendant or the driver with a gun.

Mr. Steiner also witnessed the confrontation between the victim and the defendant. While in the backyard with his children, Mr. Steiner overheard an argument, saw a red vehicle stopped in the middle of the street near the side of his home, and noticed the victim walking down the street. The victim "was minding his own business" as the defendant yelled and threatened him. Mr. Steiner did not recall exactly what the defendant yelled but stated "[I]t was basically that [the defendant] was going to come out and get [the victim]." After the defendant threatened the victim, the victim walked down the alleyway behind Mr. Steiner's home. Mr. Steiner stated there was another African-American man in the red vehicle with the defendant, and after they threatened the victim, the defendant and the driver followed the victim in the red vehicle. Mr. Steiner did not see the victim or the defendant again but heard approximately six gunshots about one minute later. After reviewing his written statement, Mr. Steiner clarified that the defendant exited the passenger side of the red vehicle and that he saw the vehicle attempt to cut off the victim by blocking his pathway. Mr. Steiner did not see a gun during the argument between the defendant and the victim.

After the shooting, Mr. Steiner and Ms. Holt generally discussed what they observed as it "was kind of crazy." The next day, both Ms. Holt and Mr. Steiner separately spoke to Investigator Pugh. Mr. Steiner provided a statement to Investigator Pugh and identified the defendant in a photographic lineup as the man he saw confront the victim, noting he reviewed the lineup before Ms. Holt. Mr. Steiner further stated Investigator Pugh did not indicate that the suspect was included in the lineup and did not make any suggestions to Mr. Steiner prior to Mr. Steiner's identification of the defendant. Mr. Steiner identified the lineup during trial, noting he signed his name under the defendant's picture after identifying the defendant. Mr. Steiner was "very" confident in his identification of the defendant and also identified the defendant during trial.

Numerous officers from the Jackson Police Department responded to the scene and participated in the pending investigation. Officer Zachary White responded at approximately 3:00 p.m. and saw the victim lying in an alleyway near Walnut and North Highland Avenue. The victim was "on his back[,] in and out of consciousness," and Officer White attempted to aid the victim with other officers. In order to locate the victim's injuries, Officer White cut off the victim's jacket, shirt, and pants. Officer White observed

gunshot wounds to the victim from which the victim was bleeding heavily and applied pressure to the victim's wounds until paramedics arrived. Officer White believed the victim was suffering from serious injuries as the victim was in and out of consciousness and in shock.

While on the scene, Officer White also took preliminary photographs, located the victim's cell phone in the pocket of the victim's jacket, and noted he did not locate a weapon or drugs on the victim. The victim's cell phone and clothing were entered into evidence, and Officer White stated the victim's pants had blood stains on them.

Captain Shepard also responded to the scene and saw the victim lying in the alleyway near North Highland Avenue. The victim was moved to an ambulance, and Captain Shepard approached the ambulance with Sergeant Laux in order to ask the victim who shot him. Captain Shepard observed the victim, noting the victim "was in grave condition. He -- he looked scared. He was -- he was sweating and seemed like he was struggling to breathe." Further, Captain Shepard stated the victim's "eyes got real (sic) wide. He was shaking. In my experience, he -- he -- he knew he was hurt bad." Sergeant Laux then asked the victim who shot him, and the victim responded, "Braxton Taylor." The victim responded "in a more of gravelly voice, but it was very clear, and it was -- it was as if he was trying to make sure that we heard the name clearly." Paramedics then insisted on leaving the scene in order to get the victim to a hospital to stabilize his condition. While the victim was in the ambulance, Captain Shepard believed paramedics were "working on him" and "pushing medicines." He thought the victim's oxygen mask had been pulled down so he could respond to Sergeant Laux's question. Captain Shepard did not see the victim lose consciousness but believed the victim was in shock.

When Sergeant Laux arrived, the victim was in an ambulance receiving medical attention. He approached the ambulance with Captain Shepard and asked the victim who shot him. More specifically, Sergeant Laux asked, "Hey, man, can you tell me who shot you," and the victim responded, "Braxton Taylor." Sergeant Laux stated the victim's "eyes were big when he turned around to look at me. [The victim] looked very concerned," "very scared, [and] worried." The victim appeared to be in distress and "looked like he was scared" but Sergeant Laux did not know if the victim was in pain and could not see the victim's injuries directly because multiple paramedics surrounded the victim. Sergeant Laux noted the victim had an oxygen mask covering his face which was "pulled back" when the victim responded. Sergeant Laux then exited the ambulance which soon left the scene. Sergeant Laux did not record his conversation with the victim.

Upon learning the defendant's name and a possible address, Sergeant Laux attempted to locate the defendant. However, Sergeant Laux was unsuccessful after being advised that the defendant no longer lived at the possible address. After officers also

located the possible suspect vehicle at another address, Sergeant Laux went to that location to assist.

Officer Secily Hasz responded to the scene where she observed the victim and took photographs. Officer Hasz also went to Jackson-Madison County General Hospital in order to photograph the victim's injuries. Four photographs of the victim's injuries were entered into evidence including a close-up of the injury to the victim's thigh.

The victim was not on the scene when Crime Scene Investigator Kevin Mooney arrived. Investigator Mooney documented and sketched the scene, collected evidence, and conducted a video "walk through" of the scene. The sketch and video footage were entered into evidence, and the video was played for the jury. While on the scene, Investigator Mooney located four spent shell casings in the south end of the alleyway "within eight feet of one another from end to end." The spent shell casings were of the same caliber and brand, "380 auto federal." Based upon the location of the spent shell casings, Investigator Mooney opined that "the shooter was basically stationary in that area." The spent shell casings were entered into evidence.

Regarding blood on the scene, Investigator Mooney stated he did not find a trail of blood between where the weapon was fired and where the victim was located after the shooting. Investigator Mooney explained "[t]he only other blood we found was on the front porch of this house to the top right. There was a little bit of blood where [the victim] had gone. I was told [the victim] went and knocked on a door and then went back into the alley." Ten photographs documenting the evidence Investigator Moody observed while on the scene were entered into evidence. He marked on the diagram where he located "a spot of blood" at the north end of the alleyway.

Investigator Pugh also testified regarding his involvement in the pending investigation, noting the defendant was developed as a suspect after the victim named the defendant as the shooter. Investigator Pugh then pulled the defendant's picture and created a photographic lineup. During his testimony, Investigator Pugh identified the lineup that he created, noting he selected pictures of similar looking individuals to complete the lineup and believed the lineup "turned out very well." He noted the top left and top right pictures depicted men who were smiling while the men in the remaining four pictures were not smiling. Regardless, Investigator Pugh stated the men in the pictures, "all have similar hairstyles. They all have facial hair above their lip. They're all basically the same build. I think this turned out very well."

Investigator Pugh also detailed the interviews he conducted during the investigation. On January 29, 2018, Ms. Holt contacted him and agreed to an interview, and Investigator Pugh went to Ms. Holt's home with the photographic lineup. After initially speaking to

Ms. Holt, Investigator Pugh determined Mr. Steiner was also a potential witness and he separated the two. Investigator Pugh interviewed Ms. Holt first but presented the photographic lineup to Mr. Steiner first. Upon his review of the lineup, Mr. Steiner identified the defendant as the man who confronted the victim prior to the shooting. Mr. Steiner signed his name below the defendant's picture. Investigator Pugh then presented the lineup to Ms. Holt, who also identified the defendant as the man who confronted the victim. In doing so, Investigator Pugh used a manila file folder to cover Mr. Steiner's signature. Investigator Pugh noted both Ms. Holt and Mr. Steiner were certain in their identifications of the defendant. Investigator Pugh used the same lineup with Mr. Steiner and Ms. Holt and stated he could have produced a second lineup but noted "when you've got two witnesses who are willing to talk to you right now, I don't like breaking away and, you know, I don't want to lose either witness."

Investigator Pugh stated U.S. Marshalls confiscated the defendant's cell phone and arrested him at an address on East Forest on January 31, 2018. After advising the defendant of his *Miranda* rights, Investigator Pugh and Sergeant Nick Donald conducted a recorded interview with the defendant, and the defendant signed an adopted written statement. The recording of the interview, the defendant's signed waiver form, and the defendant's written statement were entered into evidence, and the recording was played for the jury. Investigator Pugh also read a portion of the defendant's written statement to the jury wherein the defendant said: "'On Sunday, I was not in any alley. I was at the house on East Forest. I haven't seen [the victim] since school. I have not seen him or shot him.'"

As the investigation progressed, Investigator Pugh noted he was unable to identify the driver of the red vehicle but obtained a search warrant for the defendant's cell phone which was entered into evidence. From the cell phone records, Investigator Pugh hoped to determine the location of the defendant's cell phone at the time of the shooting in comparison to the defendant's statement that he was at a family member's home on East Forest the day of the shooting. Investigator Pugh noted the shooting occurred in the area of North Highland Avenue around 3:00 p.m. on January 28, 2018, and stated East Forest is "not very far" from where the victim was shot.

David Walker, the custodian and keeper of telephone records for AT&T, and Investigator Darrell Listenbee provided additional testimony regarding the search of the defendant's cell phone and its whereabouts at the time of the shooting. Upon receiving the search warrant for the defendant's cell phone, Mr. Walker provided law enforcement with hundreds of pages of records which were entered into evidence. The records identified the cell phone as a "Tracfone wireless" and listed the precise cell phone number associated with the phone. Additional records, called "the mobility with cell location records," included call records and cell location records for the defendant's cell phone on January 28, 2018, as requested. Mr. Walker explained that the records included information

regarding the cell phone towers utilized by the defendant's cell phone when making a call, and this information would allow for an investigator to determine both when and where a telephone call was made on the phone. Mr. Walker testified that the records do not identify who was in possession of the cell phone at the time the calls were made.

Investigator Listenbee reviewed the defendant's cell phone records as provided by AT&T. In doing so, Investigator Listenbee utilized CellHawk, a program designed to assist law enforcement which "analyze[s] and plot[s] the different cellphone records." Investigator Listenbee identified four maps of the City of Jackson that included the data he obtained from CellHawk for the defendant's cell phone records. The CellHawk documents were entered into evidence and described in further detail by Investigator Listenbee. Each map included a GPS coordinate of the cell phone tower used based upon the raw data input from the AT&T records around the time of the shooting on January 28, 2018. The maps also indicated the location of the defendant's cell phone in comparison to the location of the shooting.

As indicated on the maps, the defendant's cell phone pinged off of a tower located at 1225 North Highland Avenue at 3:09 p.m. At 3:16 p.m., the defendant's cell phone pinged off of a tower located on the 45 Bypass, to the west of the shooting. At 3:17 p.m., the defendant's cell phone pinged off of a tower located near the 45 Bypass and Interstate 40. At 3:24 p.m., the defendant's cell phone pinged off of a cell tower north of the 45 Bypass and past Interstate 40.

In summary, Investigator Listenbee stated the defendant's cell phone pinged off of a cell tower in the area of the shooting at the time of the shooting. In the fourteen minutes after the shooting, the defendant's cell phone traveled "northbound away from the scene of the crime." Therefore, the defendant's cell phone was not in the immediate vicinity of the shooting for the entirety of the day on January 28, 2018. However, Investigator Listenbee acknowledged East Forest is contained within the area of the cell phone tower that also encompasses North Highland Avenue and noted he did not know who was in possession of the cell phone as it travelled northbound.

Investigator Pugh detailed how the investigation continued in the weeks following the shooting. Investigator Pugh learned that hours after the shooting, the defendant called the police station and "asked if he had any warrants." Investigator Pugh confronted the defendant with this information during his interview, and the defendant admitted to making the phone call. The defendant explained that "his cousin had been pulled over, and the police pointed a gun at him and asked him if he was Braxton Taylor and that his cousin looked like him, so he called to see if he had warrants." Investigator Pugh explained he did not issue warrants for the defendant's arrest until January 29, 2018, after Mr. Steiner and Ms. Holt identified the defendant.

- 13 -

On February 2, 2018, Investigator Pugh tried to obtain a statement from the victim while the victim was being treated at Regional One. The victim, however, was unresponsive. While at Regional One, Investigator Pugh collected a bullet that was removed from the victim's body during surgery. After the victim died on February 11, 2018, Investigator Pugh attended the victim's autopsy.

On February 22, 2018, Investigator Pugh attended the defendant's preliminary hearing in Jackson City Court. After the hearing, he learned of another potential witness, Daniel Leggett, who the State presented at trial. Mr. Leggett admitted to pleading guilty to driving on a suspended license and stated he was in the holding cell of Jackson City Court with the defendant on February 22, 2018. Mr. Leggett identified the defendant at trial and stated that while in the holding cell, Mr. Leggett overheard the defendant confess to the crimes for which he was charged. Specifically, Mr. Leggett stated that when the defendant was asked if he was guilty of his charges, the defendant responded, "['Y]es, yeah, fool, I did it, but I ain't going to tell them that,['] talking about the police officers and what not." Mr. Leggett explained the defendant "was the main focus of everyone's attention" because "he was the only one back there with such high charges." Mr. Leggett was unaware of any other person in the holding cell who was also charged with murder.

Approximately two days after his release, Mr. Leggett saw Mr. Steiner, whom he had known for about two years, at a bar. While talking with Mr. Steiner, Mr. Leggett learned the defendant was charged with murder and that Mr. Steiner was also a witness, and Mr. Steiner learned that Mr. Leggett heard the defendant admit guilt while in the holding cell. As such, Mr. Leggett provided his contact information to Ms. Holt, and shortly after this exchange, Investigator Pugh contacted Mr. Leggett. Mr. Leggett provided a written statement to Investigator Pugh which detailed that he overheard the defendant admit guilt in the holding cell. When he spoke with Investigator Pugh, Mr. Leggett's criminal case had already been resolved, and Mr. Leggett stated he was not offered anything in exchange for his testimony by either Investigator Pugh or the district attorney's office.

Mr. Leggett stated prior to being charged with driving on a suspended license he had not been to jail or charged with a crime. However, he admitted to being charged with theft of property in Milan City Court in 2014. Mr. Leggett explained that he paid off his fines for the misdemeanor theft charge and "had not thought about that since you just brought it up just now."

Investigator Pugh testified that he received Mr. Leggett's contact information from Ms. Holt and called Mr. Leggett as a result. Investigator Pugh also confirmed the defendant would have been in the holding cell on February 22, 2018, for his preliminary hearing and

noted that Mr. Leggett told him that Marquese Wood and Eric England were also in the holding cell that day. Investigator Pugh, however, did not speak to Mr. Wood or Mr. England as part of his investigation but did verify with Jackson City Court that Mr. England was in jail around the same time the defendant and Mr. Leggett were in jail. According to Investigator Pugh, Mr. Leggett's case was resolved when Mr. Leggett provided information on the defendant's case.

Finally, Dr. Katrina Van Pelt testified as an expert in the field of forensic pathology in the manner and cause of death. Dr. Van Pelt performed the autopsy of the victim on February 12, 2018, the day after the victim was pronounced dead at Regional One. Dr. Van Pelt noted the victim suffered four gunshot wounds which caused four entrance wounds and three exit wounds. She detailed the wounds further, noting one bullet entered the left side of the victim's mid-back and exited through the front of his chest. A second bullet also entered through the mid-back and exited through the victim's mid-torso. A third bullet entered through the victim's right buttock and exited above the left hip. And, the fourth bullet entered through the right thigh but did not exit the victim's body, rather, the projectile was found during surgery. Dr. Van Pelt acknowledged the gunshots were fired from an "indeterminate range," meaning she did not know the range of the shots but noted it was not a contact wound as there was no soot or stippling found on the victim's body. She determined the victim's cause of death to be "[g]unshot wounds of torso and right thigh" and the manner of death to be homicide.

In performing the autopsy, Dr. Van Pelt observed "a lot of medical intervention" associated with the victim's gunshot wounds, noting the victim received significant medical treatment and surgery between the time of the shooting and his death. Dr. Van Pelt, however, ruled out the possibility that the medical treatment caused the victim's death, stating, "I went through the medical records and at autopsy, there was nothing egregious or anything that would have made me suspicious for anything." Furthermore, due to the medical intervention provided to the victim, Dr. Van Pelt was unable to determine an exact wound path for his injuries. Dr. Van Pelt's autopsy report that she completed with Dr. Erica Curry was entered into evidence. The State then rested its case.

The defendant moved for a judgment of acquittal which was denied by the trial court. Marquese Wood then testified on behalf of the defendant, stating he was currently an inmate in the county jail as he awaited transfer to the Tennessee Department of Correction for an aggravated burglary conviction. On February 22, 2018, Mr. Wood was in Madison County Jail where he encountered the defendant. According to Mr. Wood, the defendant "never made no statement about shooting nobody." Mr. Wood stated he was beside the defendant and heard everything the defendant said while in jail but also admitted they were separated at various times. Further, Mr. Wood noted he was not interviewed by law enforcement regarding the defendant and stated he was not offered anything in

- 15 -

exchange for his testimony. Despite admitting to prior theft and aggravated burglary convictions, Mr. Wood believes he is an honest person. Mr. Wood also admitted to being shot in the head, chest, and arm but stated it did not affect his memory. The defendant did not present any additional proof.

Upon its deliberations, the jury convicted the defendant of second-degree murder and unlawful possession of a weapon and imposed fines of $7500 and $2500, respectively. After a sentencing hearing, the trial court waived the fines and imposed an effective sentence of twenty-five years' incarceration which was to be run consecutively to a previously imposed six-year sentence. The defendant filed a motion for a new trial which was denied by the trial court. This timely appeal followed.

## *Analysis*

The defendant challenges two, pre-trial evidentiary rulings of the trial court concerning the denial of the defendant's motions to suppress the victim's statement as a dying declaration and the photographic lineup as unduly suggestive and unreliable. We will address each in turn.

Suppression issues on appeal are subject to a well-established standard of review. Appellate courts are bound by a trial court's findings of facts determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Matthew T. McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2 (Tenn. Crim. App. Sept. 13, 2012). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Appellate courts should consider the entire record, affording the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence." *McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2 (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)); *see also State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). However, applying the law to the factual findings of the trial court is a question of law, which is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). When reviewing the trial court's ruling on a motion to suppress, appellate courts may consider the evidence presented at both the suppression hearing and the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

## I. *The Dying Declaration*

The defendant asserts the trial court erred in denying his motion to suppress the victim's statement wherein he named the defendant as his shooter, arguing the statement

did not meet the requirements of the dying declaration exception to the rule against hearsay. Generally, hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Though hearsay is not admissible evidence, certain exceptions to the rule against hearsay exist. One such exception allows for the admission of a statement made under the belief of impending death, otherwise known as a dying declaration. Tenn. R. Evid. 804(b)(2). This exception provides: "In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death." *Id.* "The rationale for this hearsay exception is that one facing imminent death will be truthful for fear of 'eternal consequences.'" *State v. Hampton*, 24 S.W.3d 823, 828 (Tenn. Crim. App. 2000) (quoting Neil P. Cohen, et al., *Tennessee Law of Evidence,* § 804(b)(2.1) at 599 (3d ed.1995)).

This Court has stated that in order for a statement to be admissible as a dying declaration, five elements must be met:

> (1) The declarant must be dead at the time of the trial;
> (2) the statement is admissible only in the prosecution of a criminal homicide;
> (3) the declarant must be the victim of the homicide;
> (4) the statement must concern the cause or the circumstances of the death; and
> (5) the declarant must have made the statement under the belief that death was imminent.

*Id.* at 828-29 (citation omitted). Thus, the dying declaration exception requires that "the declarant must have a 'fixed and solemn belief that death is inevitable and near at hand.'" *Id.* at 829 (quoting 41 CJS *Homicide* § 274 (1991)). The final element "provides the indicia of reliability and truth that justifies admission of the statement." *State v. David Smith*, No. W2009-02002-CCA-R3-CD, 2010 WL 2482326, at *6 (Tenn. Crim. App. June 17, 2010) (citation omitted). However, "it is not necessary that the declarant state unequivocally a belief that death is imminent." *Id.* (citing *State v. Maruja Paquita Coleman*, No. 01C01-9401-CR-00029, 1997 WL 438169, at *5 (Tenn. Crim. App. July 31, 1997) (footnotes omitted), *perm. app. denied* (Tenn. Apr. 13, 1998)). "Awareness of impending death has been inferred from the language and condition of the declarant, the facts and circumstances surrounding the statement, and medical testimony concerning the seriousness of the victim's condition." *Id.*

Here, the defendant does not challenge the first four elements as a bar to the admissibility of the victim's statement, and the record makes clear these elements were

met. Rather, the defendant argues the victim did not believe his death was imminent when he named the defendant as his shooter, and thus, the statement cannot satisfy the last element required for admissibility as a dying declaration. *Id.* at 828-29. We, however, disagree as the record is replete with evidence supporting the trial court's determination that the victim believed his death was imminent when he made the statement.

In examining the admissibility of the victim's statement as a dying declaration, the trial court stated:

> The [c]ourt found that based on the circumstances, the victim's identification of [the defendant] as the shooter qualifies as a [d]ying [d]eclaration. The victim did ultimately die from his injuries, is clearly unavailable for trial, this is a criminal homicide prosecution, the declarant is the victim, the statement concerned the manner and circumstances surrounding his death, and based on all the evidence at the hearing, it was made while the victim was under the belief his death was imminent.

We agree with the trial court's assessment. The record includes testimony from Officer White, Sergeant Laux, Captain Shepard, Dr. Revelle, and Dr. Van Pelt regarding the victim's condition after the defendant shot him four times. Upon his arrival to the scene, Officer White stated the victim was fading in and out of consciousness, was in shock, and was bleeding heavily from multiple gunshot wounds. Officer White believed the defendant was suffering from serious injuries, and the victim was moved to an ambulance for additional medical attention.

While in the ambulance, Captain Shepard observed the victim, stating the victim was in a grave condition, looked scared, was sweating and shaking, and was struggling to breath. Sergeant Laux stated that as the victim received medical attention in the ambulance, the victim appeared to be in distress, looked concerned, scared, and worried, and was using an oxygen mask. At this point, Sergeant Laux asked the victim who shot him, and the victim named the defendant. No additional questions were permitted as paramedics quickly left the scene in order to transport the victim to the nearest hospital.

When the victim arrived at the hospital, Dr. Revelle stated he was in critical condition with life-threatening injuries as a result of four gunshot wounds. Dr. Revelle provided life support treatment, which included intubation, before transferring the victim to a Level 1 trauma center where he subsequently died. Dr. Van Pelt testified the victim died from the gunshot wounds despite significant medical intervention. Accordingly, we conclude that the trial court did not err in admitting the victim's statement into evidence under the dying declaration exception to the rule against hearsay.

- 18 -

In support of his argument, the defendant asserts that the victim did not lose consciousness while on the scene, Captain Shepard and Sergeant Laux gave varying accounts as to whether the victim was shaking or sweating, Sergeant Laux did not observe any blood when talking to the victim nor could he "determine the source of [the victim's] injuries," and the victim's "medical condition at the hospital supports a finding that [the victim's] death was not imminent." We again disagree as the evidence showed that at the time of the statement, the victim had been shot four times, was in shock, having trouble breathing, was bleeding, and was fading in and out of consciousness. The victim received medical attention on the scene and required additional medical treatment in the emergency room of Jackson-Madison County General Hospital and from a Level I trauma center prior to his death. Though he died in the weeks following the shooting, Dr. Revelle indicated that the proximity of the crime scene to the hospital and the treatment provided by both the paramedics and emergency room personnel prevented the victim from dying sooner. From these facts and circumstances, it can be inferred that the victim believed his death was imminent when he made the statement to Sergeant Laux. As such, the trial court did not err in admitting the statement as a dying declaration, and the defendant is not entitled to relief.

## II. *The Photographic Lineup*

The defendant argues the trial court erred "by allowing into evidence [Ms.] Holt and Mr. Steiner's pre-trial and in-court identifications of [the defendant], which were based on an unduly suggestive photo lineup." The defendant asserts the lineup was suggestive because the defendant's picture "was 'grossly dissimilar' from the other five photos due to the poor lighting in his photo." The defendant states that "[w]hile all six photos depict similarly aged black men with similar hairstyles and varying degrees of facial hair, [the defendant's] photo is indiscernible with the exception of his outline." The defendant further argues "[i]f this Court finds that the photo lineup was improperly suggestive, it should also find that the identification procedure was unreliable under the totality of the circumstances." The defendant suggests that "[t]he facts that [Ms.] Holt and Mr. Steiner chose the most obscure, vague photo in the lineup must render their reliability suspect because it suggests they could only recall that the passenger was a young black man." The State disagrees, arguing "the trial court properly denied the motion [to suppress] after finding that the lineup was not unduly suggestive and that it was reliable." We agree with the State.

Pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution, the pretrial identification of a defendant by photograph will only be suppressed if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). "[D]ue process concerns arise only when law

enforcement officers use an identification procedure that is both suggestive and unnecessary," and only if the eyewitness's identification "is tainted by police arrangement." *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012). Suppression of the photographic identification is not always necessary even if the police do use a suggestive and unnecessary procedure. *Id*. at 239. Instead, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conductive to irreparable mistaken identification that [the accused] was denied due process of law.'" *State v. Hall*, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)).

In *Biggers*, the United States Supreme Court set forth the test for determining whether the pretrial identification of a defendant is admissible as evidence at trial. First, this two-part analysis requires the trial court to determine whether the identification procedure was unduly suggestive. *Biggers*, 409 U.S. at 198. The identification cannot be "conducted in such an impermissibly suggestive manner to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998). If the court finds the identification procedure was unduly suggestive, then the second question is whether the identification was reliable despite this undue suggestion. *Biggers*, 409 U.S. at 198-99. When making this determination, courts are to consider the following:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id*. at 199-200. The corrupting effect of the suggestive procedure is weighed against these factors. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). If, after considering these factors, the court concludes the identification was so unduly suggestive that it violated the defendant's due process rights, then the court must exclude the photographic lineup from evidence. *State v. Shanklin*, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980). The court, however, need not apply these factors if it does not first conclude law enforcement used an unnecessarily or impermissibly suggestive procedure or that the identification procedure used created a substantial likelihood of irreparable misidentification. *Biggers*, 211 S.W.3d at 749.

In denying the defendant's motion to suppress, the trial court held:

> The [c]ourt specifically found that the line-up was not suggestive, that the photos were all very similar, and that the identification by both witnesses was positive. The [c]ourt further found that Investigator Pugh did not engage

in any behavior that could have suggested which photo either witness should select. [Mr.] Steiner had no hesitation about his identification of the defendant's photo and his identification was based on his own observations of the defendant. Similarly, [Ms.] Holt sounded very credible to the [c]ourt, she had no hesitation about identifying the defendant, remembered the events from the incident very clearly, and when she viewed the line-up, based on the totality of the circumstances, could not have seen any markings or anything about the line-up that would have affected her identification one way or the other. Based on the above both witnesses' identification was not suggestive and was reliable.

We agree with the assessment of the trial court. Though the defendant argues the lineup was unduly suggestive based upon the difference in lighting between the top and bottom pictures in the lineup, the record does not support this contention. Rather, the record demonstrates Investigator Pugh created a photographic lineup containing six images of similar looking individuals. In particular, he chose images of individuals with similar build, complexion, hair, and facial hair and believed the lineup turned out well. Nothing in the record indicates and the defendant has failed to show that the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384.

Furthermore, Mr. Steiner and Ms. Holt's identifications of the defendant were reliable based on the totality of the circumstances. Both Mr. Steiner and Ms. Holt witnessed the defendant confront and threaten the victim. They reviewed the lineup the day after witnessing the confrontation, and both were certain in their identification of the defendant. Accordingly, we conclude the trial court did not err when denying the defendant's request to suppress the lineup or Mr. Steiner and Ms. Holt's identifications of the defendant. The defendant is not entitled to relief on this issue.

III.    *Jury Instructions*

The defendant contends the trial court failed to properly instruct the jury concerning the dying declaration. Specifically, the defendant argues the trial court committed reversible error by failing to provide the jury with the Tennessee Pattern Jury Instruction 42.15. The defendant requests plain error review of this issue, acknowledging he failed to raise the issue in his motion for a new trial. The State concedes the trial court erred in failing to instruct the jury concerning the victim's dying declaration. However, the State asserts the defendant is not entitled to plain error relief because the error was harmless, and as such, the defendant cannot meet "his burden of demonstrating that consideration of the error is necessary to do substantial justice." We agree with the State.

Under the plain error doctrine, a defendant may obtain relief only if all of the following criteria are satisfied: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the issue was not waived for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016); *State v. Hester*, 324 S.W.3d 1, 56 (Tenn. 2010).

The defendant argues he was prejudiced by the trial court's failure to instruct the jury regarding the dying declaration. Tennessee Pattern Jury Instruction 42.15 provides:

> Testimony has been presented of a dying declaration allegedly made by the deceased. A dying declaration is a statement made with a sense of impending death, and for this reason it is to be considered as equivalent to a statement made under oath. You must first determine what statements, if any, were made by the deceased. If any such statements were made, then you should determine what weight or credit, if any, should be given to them. You should also consider the circumstances prevailing at the time the declaration is alleged to have been made.
>
> This testimony comes to you through others, and it is not to be considered as if the deceased had appeared at this trial and testified as did other witnesses. The deceased is not in condition, frequently, to give calm attention to the question to which [he] makes [his] statement. You should take into consideration the reasonableness or unreasonableness of the statements allegedly made by the deceased; the contradictions, if any, by [his] interest or lack of interest, [his] intelligence, and [his] position and situation to know the facts. You should bear in mind that the defendant was not present when the declaration was allegedly made and had neither the opportunity to make suggestions, nor call attention to the circumstances in [his] favor, nor to cross-examine to show inaccuracies of memory, nor expose bias from passion or prejudice. For these reasons, this evidence should be received by you with caution.

7 Tenn. Prac. Pattern Jury Instr. T.P.I. Crim. 42.15. The trial court's failure to instruct the jury on the weight to be given the victim's dying declaration usually constitutes prejudicial error. See *State v. Branam*, 604 S.W.2d 892, 895 (Tenn. Crim. App. 1980); *Humphreys v. State*, 64 S.W.2d 5 (1933); *Pearson v. State*, 226 S.W. 538 (1920).

Here, the record makes clear the trial court erred by failing to instruct the jury regarding the dying declaration. However, the record also contains plenty of evidence supporting the veracity of the victim's dying declaration, rendering the error harmless.

- 22 -

Both Mr. Steiner and Ms. Holt overheard the defendant threaten the victim, observed the defendant follow the victim as he turned down the alleyway, and heard gunshots within minutes of the confrontation. The day after the shooting, Ms. Holt and Mr. Steiner positively identified the defendant in a photographic lineup. In addition, the defendant's cell phone was in the area of the shooting when it occurred, and the defendant called the police station in the hours after the shooting to ask if there was a warrant for his arrest. Based upon this evidence, the record indicates the trial court's error in failing to instruct on the weight to be given to the victim's dying declaration could not have affected the outcome of the trial as the record contains sufficient evidence supporting the defendant's convictions aside from the dying declaration. As a result, the defendant has failed to show how consideration of the trial court's error is necessary to do substantial justice, and he is not entitled to plain error relief. *Martin*, 505 S.W.3d at 504; *Hester*, 324 S.W.3d at 56; *see Wooten v. State*, 103 S.W.2d 324, 326 (1937) (finding the trial court erred in failing to instruct the jury on the deceased's dying declaration but refusing to reverse the conviction because it was "plainly apparent that this error did not affect the result" as there was "no issue whatever on the record as to the fact that [the defendant] shot the deceased."). Accordingly, the trial court's failure to instruct on the weight to be given the dying declaration was harmless, and plain error relief is not warranted. The defendant is not entitled to relief.

## IV.    Cumulative Error

The defendant asserts "the trial court's error in admitting [the victim's] purported dying declaration into evidence, failure to instruct the jury on how to weigh [the victim's] statement, and error in admitting [Ms.] Holt and Mr. Steiner's identification of [the defendant] into evidence more probably than not affected the verdict and deprived [the defendant] of a fair trial." The defendant argues the errors alleged, "taken either individually or in conjunction with one another," had a cumulative effect on the jury's verdict, requiring reversal of the convictions and remand for a new trial. The State asserts "there was not more than one error in the trial proceedings," "[t]here are no errors to cumulate," and the defendant is not entitled to cumulative error relief. We agree with the State.

The cumulative error doctrine applies when multiple errors were committed during trial, each of which alone would have constituted harmless error, but in the aggregate have a cumulative effect on the proceedings so great the defendant's right to a fair trial can only be preserved through reversal. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Circumstances warranting reversal of a conviction under the cumulative error doctrine "remain rare." *Id*. The defendant raised two evidentiary issues and a jury instruction issue on appeal. Of those issues, we have discerned only one error, that being the trial court committed harmless error in failing to properly instruct the jury regarding the weight to be

given to the victim's dying declaration. Relying on our foregoing analysis, the record makes clear the State presented more than enough evidence of the defendant's guilt, and the single instance of harmless error found on appeal does not entitle the defendant to relief under the cumulative error doctrine. This issue is without merit.

*V.    Sentencing*

Finally, the defendant argues the trial court abused its discretion in enhancing his sentence for second-degree murder above the statutory minimum. Before imposing a sentence upon a defendant, the trial court must first consider these factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103.

When the record establishes the sentence imposed by the trial court was within the appropriate range and reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The trial court must state on the record the factors it considered and the reasons for ordering the sentence imposed. Tenn. Code Ann. § 40-35-210 (e); *Bise*, 380 S.W.3d at 706. If a trial court misapplies an enhancement or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Here, the record indicates the trial court sentenced the defendant as a Range I, standard offender for his crime of second-degree murder. Second-degree murder is a Class A felony. Tenn. Code Ann. § 39-13-210(c)(1). The potential sentencing range for a Range I offender convicted of a Class A felony is between fifteen and twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). The defendant received a twenty-five-year sentence for the

second-degree murder conviction.[1]  Therefore, the sentence imposed by the trial court fell within the appropriate sentencing range for the defendant's offense and is presumed reasonable by this Court.  *Bise*, 380 S.W. 3d at 707; *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

The defendant argues the trial court improperly enhanced his sentences by relying on his alleged gang affiliation, but we disagree.  The record indicates the trial court properly considered the statutory factors required under Tennessee Code Annotated section 40-35-210 prior to sentencing the defendant.  Specifically, the trial court reviewed the presentence report, the evidence presented at the trial and sentencing hearing, the arguments of counsel, the nature and characteristics of the criminal conduct involved, the applicable enhancement and mitigating factors, and the defendant's potential for rehabilitation.  The presentence report listed the defendant's criminal history which included convictions for aggravated burglary, theft of property over $2500, shoplifting, and speeding along with criminal behavior committed while in custody for his present crimes.

In assessing the applicable enhancement and mitigating factors, the trial court determined no mitigating factors applied to the defendant's conviction other than "some slight consideration for the fact that [the defendant] is a young offender."  Tenn. Code Ann. § 40-35-113(6).  However, the trial court found numerous enhancement factors applied, including: (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;" (2) "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors;" (8) "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community;" (9) "[t]he defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;" and (13) "[a]t the time the felony was committed" the defendant was "[r]eleased on probation" or "[o]n some form of judicially ordered release."  Tenn. Code Ann. § 40-35-114 (1), (2), (8), (9), & (13).  The trial court also noted the defendant "is a high risk to reoffend" as demonstrated by the presentence report.

Despite these findings, the defendant argues the trial court improperly weighed his alleged gang affiliation when sentencing him to the top of the applicable range.  The record indicates the trial court did discuss the defendant's gang affiliation, as follows:

Now, I also find, according to this report, he is a documented gang member.  I find that to be proven.  According to the report, he's identified

---

[1] The jury convicted the defendant of the Class A misdemeanor of unlawful possession of a weapon in count 2, and the trial court imposed a concurrent sentence of eleven months and twenty-nine days.  The defendant does not challenge this portion of his sentence on appeal.

and confirmed as of July the 10th, 2019 to be a member of the Crips criminal street gang, which, again, I think shows perhaps some motive as to why this murder occurred back in January of 2018.

Before imposing the sentence, the trial court also stated, "Again, I think the gang member ties is something that I'm looking at." Based upon these comments, the defendant argues the trial court erred in sentencing him to the maximum sentence within the appropriate range, asserting the trial court improperly weighed his alleged gang affiliation against him. We disagree. Though the trial court commented on the defendant's gang affiliation before imposing the sentence, nothing in the record indicates the trial court improperly relied on the defendant's gang affiliation in determining the sentence length. Rather, the trial court stated on the record the five specific enhancement factors it considered and was relying on in support of the sentence imposed. Tenn. Code Ann. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. Contrary to the defendant's claim, the trial court properly considered the statutory criteria in finding the defendant to be a Range I, standard offender and imposed a within-range sentence for the defendant's conviction for second-degree murder to be served in confinement. Nothing in the record indicates the length of the sentence imposed was improper, and our supreme court has made clear "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." *Bise*, 380 S.W.3d at 706. The defendant is not entitled to relief.

### *Conclusion*

Based on the foregoing, we affirm the judgments of the trial court.

 

_____
J. ROSS DYER, JUDGE